# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1) Venom 64, Inc. d/b/a Western Nights,** *an Oklahoma Corporation;* **(2) Glenn's Roadhouse, LLC d/b/a Roadhouse Bar & Grill,** *an Oklahoma Limited Liability Company;* **(3) Six Shooter Saloon, LLC d/b/a Six Shooter, Saloon,** *an Oklahoma Limited Liability Company;* **(4) Brent Barnett,** *an individual;* **(5) Kari Rehl,** *an individual;* **(6) Lacy Gilworth,** *an individual;* **and** **(7) Augustin Ramon,** *an individual;* | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Plaintiffs.** | ) ) | **Case: 5:20-CV-01190-JD** |
| **vs.** | ) ) | |
| **(1) City of Oklahoma City,** **(2) David Holt,** *in his official capacity as Mayor of Oklahoma City*; **and** **(3) Wade Gourley,** *in his official capacity as Chief of Police of the City of Oklahoma City;* | ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## INTRODUCTION

1.      This case seeks to protect Oklahomans and Oklahoma businesses from a government that is acting outside the scope of its authority. It is an action for declaratory relief pursuant to 12 O.S. § 1651 challenging the Oklahoma City Mayor's Revised Proclamation of State of Emergency dated November 19, 2020 (the Proclamation). The Proclamation was made without any legal basis under Oklahoma law and it violates Oklahoma law, the Constitution of the State of Oklahoma, and the Constitution of the United States.

2.      Pursuant to 12 O.S. § 1651, Plaintiffs seek a declaration that the Proclamation is void and contains no legally binding mandates. Pursuant to 12 O.S. § 1381 *et seq.*, Plaintiffs seek a temporary restraining order then a temporary and permanent injunction enjoining the enforcement of the Proclamation.

## JURISDICTION AND VENUE

3.      This action arises under the Oklahoma Constitution and laws of the State of Oklahoma. Jurisdiction is conferred on this Court pursuant to 12 O.S. §§ 1651 & 1381 *et seq.*

4.      The issues in this case relate to events that occurred and are occurring within Oklahoma County, Oklahoma.

5.      Venue and jurisdiction are proper for this Court pursuant to 12 O.S. §§ 133 & 1651.

## PARTIES

6.      Plaintiff Venom 64, Inc. d/b/a Western Nights (Western Nights) is a business located at 1164 N MacArthur Blvd, Oklahoma City, OK 73127. This is in Oklahoma County.  On November 20, 2020 at approximately 9:30 p.m., two officers from the Oklahoma

City Police Department showed up at Western Nights. The officers told the owners that their department intended to enforce the Proclamation and that Western Nights was to shut down at 11:00 p.m. Additionally, the officers told the owners of Western Nights the section of the Oklahoma City municipal code that they would be cited for violating—§ 15-40. Based on this clear threat of criminal prosecution, Western Nights closed at 11:00 p.m. on November 20, 2020 and will continue to close each night at 11:00 p.m. so long as the Proclamation is in effect. On November 20, 2020, the number of patrons at Western Nights was down 80% from a typical Friday night at this time of the year. This resulted in Western Nights losing income and suffering harm. This damage cannot be undone. Approximately 75% of beverage sales at Western Nights come after 11:00 p.m. Closing each night at 11:00 p.m. will cause Western Nights to lose at least that percentage in sales every night.

7.     Plaintiff Glenn's Roadhouse, LLC d/b/a Roadhouse Bar & Grill (Roadhouse) is a business located at 6716 Main St, Oklahoma City, OK 73169. This is in Oklahoma County.  Roadhouse's revenue has decreased approximately 40% since the Proclamation went into effect. Roadhouse expects the lost revenue to get worse the longer the Proclamation remains in effect.

8.     Plaintiff Six Shooter Saloon, LLC d/b/a Six Shooter Saloon is a business located at 10300 S Sooner Rd, Oklahoma City, OK 73165. This is in Cleveland County.  The harm inflicted on Six Shooter Saloon emanates from Oklahoma County. Since the Proclamation has gone into effect, Six Shooter Saloon has remained in business for just two days. It will remain closed until the Proclamation is no longer in effect. Business was down the Friday after the Proclamation went into effect 97% from the previous Friday. Nobody showed up

the next night. Over 80% of the sales at Six Shooter Saloon happen after 10:30 p.m. If the proclamation remains in effect much longer, Six Shooter Saloon will likely close permanently.

9.      Plaintiff Brent Barnett works as a bartender at a bar in Oklahoma City and within Oklahoma County. His employer told him to not come to work on November 20, 2020 due to the anticipated low turnout of patrons. Mr. Barnett has already suffered harm under this Proclamation by losing an entire night's income. Due to the credible threat of criminal prosecution, the bar that Brent works at will close at 11:00 p.m. each night while the Proclamation is in effect. If the Proclamation continues to be enforced, Mr. Barnett's income will be reduced by approximately 70%. Of course, this is assuming the bar where he works stays open. If it decides to shut down because they lose less money by shutting down, then Mr. Barnett's income will be reduced by 100%. This future harm is severe, certain, and irreparable.

10.      Plaintiff Kari Rehl works as a bartender at a nightclub in Oklahoma City and within Oklahoma County. Ms. Rehl's income dropped over 85% from the weekend before the Proclamation went into effect to the weekend the Proclamation was in effect. Ms. Rehl will continue to see at least this level of decrease in income if the Proclamation remains in effect.

11.      Plaintiff Lacy Gilworth works as a manager, bartender, and waitress at a nightclub in Oklahoma City and within Oklahoma County. Ms. Gilworth's income dropped over 75% from the weekend before the Proclamation went into effect to the weekend the

Proclamation was in effect. Ms. Gilworth will continue to see at least this level of decrease in income if the Proclamation remains in effect.

12.     Plaintiff Augustin Ramon works as a DJ at a nightclub in Oklahoma City and within Oklahoma County. Mr. Ramon's income dropped by over 90% from the weekend before the Proclamation went into effect to the weekend the Proclamation was in effect. Mr. Ramon will continue to see at least this level of decrease in income if the Proclamation remains in effect.

13.     Defendant City of Oklahoma City is a city incorporated in the State of Oklahoma. It is a municipal corporation with the right to be sued.

14.     Defendant David Holt is the Mayor of the City of Oklahoma City. He is sued in his official capacity only. He acts in his official capacity in Oklahoma County.

15.     Defendant Wade Gourley is the Police Chief for the City of Oklahoma City. He is charged with enforcing Oklahoma law, including the Proclamation. He is sued in his official capacity only. He acts in his official capacity in Oklahoma County.

## STATEMENT OF FACTS

16.     On March 15, 2020, Governor Kevin Stitt issued Executive Order 2020-07. He declared an "emergency caused by the impending threat of COVID-19 . . . ." A true and correct copy of this order is attached as Exhibit 1 and is found at https://www.sos.ok.gov/documents/executive/1913.pdf. Governor Stitt declared the order pursuant to power vested in him by Article VI § 2 of the Oklahoma Constitution. He stated that "it is now necessary to provide for the rendering of mutual assistance among the State and political subdivisions of the State and to cooperate with the Federal government with

respect to carrying out emergency functions during the continuance of the State emergency pursuant to the provisions of the Oklahoma Emergency Management Act of 2003."

17.     Mayor Holt declared a state of emergency in Oklahoma City in a proclamation on March 16, 2020 due to COVID-19. COVID-19 EMERGENCY RESTRICTIONS IN OKLAHOMA CITY https://www.okc.gov/residents/prepare-okc/know-what-to-do/covid-19-coronavirus-in-okc/covid-19-emergency-restrictions-in-oklahoma-city (last visited Nov. 22, 2020). The proclamation was revised on March 28, 2020, April 2, 2020, April 29, 2020, May 14, 2020, May 29, 2020, May 31, 2020, June 2, 2020, and July 2, 2020. *Id.*

18.     On November 16, 2020, Governor Stitt issued his Seventh Amended Executive Order 2020-20. A true and correct copy of this order is attached as Exhibit 2 and is found at https://www.sos.ok.gov/documents/executive/1971.pdf. This executive order added the following language:

> 25. Effective November 19, 2020, restaurants and bars shall ensure a minimum of six (6) feet of separation between parties or groups at different tables, booths, or bar tops, unless the tables are separated by properly sanitized glass or plexiglass.
> 26. Effective November 19, 2020, food or beverages of any kind shall not be sold, dispensed, or served for on-premises consumption by any license holder authorized to make such sales or services after 11:00 P.M. CST daily. The sale and service of food and non-alcoholic beverages for on-premises consumption may resume at 5:00 A.M. CST daily. The sale and service of alcoholic beverages for on-premises consumption may resume at 8:00 A.M. CST daily.

19.     On November 19, 2020, Mayor Holt issued the Proclamation. A true and correct copy of this order is attached as Exhibit 3 and is found at https://www.okc.gov/home/showdocument?id=20448. In the Proclamation, Mayor Holt states, "Title 21, Section 1321.9 of the Oklahoma Statutes allows cities and towns to enact

ordinances to issue a Proclamation of State of Emergency . . . ." Sections 1321.1–1321.11 of Title 21 of the Oklahoma Statutes are referred to as the Riot Control and Prevention Act (RCPA). OKLA. STAT. tit. 21 § 1321.1. Sections 15-36–15-40 of the Oklahoma City Municipal Code are Oklahoma City's version of the RCPA (OKC RCPA). Mayor Holt further states in the Proclamation, "Section 15-37 of the Oklahoma City Municipal Code provides that I, as the Mayor, after finding that a public disaster exists which affects life, health, property or the public peace, may proclaim a state of emergency in the area affected . . . ." In addition to the above restrictions in Governor Stitt's Seventh Amended Executive Order, the Proclamation added the following:

> All restaurants, bars, breweries, wineries, taverns, shopping mall food courts, food halls, and cafeterias are restricted to providing only take-out, drive-thru service, or delivery of food and beverages during the time listed above. During those times, patrons may enter the building to receive carry-out service for consumption off the premises, but the interior spaces of such locations are otherwise closed to the public and persons, other than employees, and are restricted from such places for any other purpose.

20.    The Proclamation further states, "Any person, including but not limited to a business owner or employee, not complying with the requirements of this Proclamation shall be subject to Section 15-40 of the Oklahoma City Municipal Code." Section 15-40 of the Oklahoma City Municipal Code states, "Any person violating a provision of this article or any proclamation or order issued pursuant hereto shall be guilty of a Class "b" offense and upon conviction be punished by a fine not exceeding $750.00, excluding costs or imprisonment in the City Jail not exceeding six months, or both such fine and imprisonment." OKLAHOMA CITY, OKLA., CODE § 15-40.

**FIRST CAUSE OF ACTION**
**Declaratory Relief**

21.     Plaintiffs hereby incorporate by reference all stated paragraphs.

22.     Pursuant to 12 O.S. § 1651, Plaintiffs request this Court to determine that the Proclamation is outside the scope of the RCPA and OKC RCPA.

23.     A municipality may only act pursuant to the authority given to it by the State of Oklahoma. Any action by the State of Oklahoma or a municipality must be authorized by law. The Oklahoma law a municipality acts pursuant to must be appropriate for the situation the municipality is acting upon. Succinctly, a municipality is not free to impose restrictions on its citizens and refer to an irrelevant state law to justify the unlawful restrictions.

24.     The OKC RCPA contains almost identical language to that in the RCPA. As one can tell from the title, the RCPA's aim is to quell civil disorder if it breaks out and prevent disorder when it appears likely to happen. Examples of events that the RCPA would apply to include a tornado or large explosion that destroys a significant part of a city. These are events in which access to utilities or law enforcement may be difficult. The RCPA allows the governor to proclaim a state of emergency when he determines "that a public disorder, disaster or riot exists within this state or any part thereof which affects life, health, property or the public peace." tit. 21 § 1321.3. Upon such a proclamation, the governor gets certain extraordinary powers. *Id.* § 1321.4. These powers are aimed at restoring public order and preventing further violence or property destruction. *Id.* Some of the new powers the governor assumes include imposing a curfew, limiting gatherings of people, prohibiting

the possession of Molotov cocktails, closing roads, and placing restrictions on the consumption of alcohol. *Id.* The RCPA allows cities and towns to enact ordinances "in general conformity with" the RCPA. *Id.* § 1321.9.

25.    The OKC RCPA was enacted pursuant to the RCPA. It explicitly references "State Law reference— Oklahoma Riot Control and Prevention Act, 21 O.S. § 1321.1 et seq." as its authority. OKLAHOMA CITY, OKLA., CODE Article III. This means only that the OKC RCPA *as written* is permissible under Oklahoma law—not that Mayor Holt's *application of* the OKC RCPA to a pandemic is lawful.

26.    The plain language and history of the RCPA and the ordinances authorized by it make it clear that the RCPA and OKC RCPA were never intended to apply to pandemics or infectious disease outbreaks. Furthermore, Governor Stitt has never invoked the RCPA in his emergency orders.

27.    The RCPA's purpose is the maintenance and, if necessary, restoration of public order. Unsurprisingly, the OKC RCPA, enacted pursuant to the RCPA's delegation of authority, is aimed at the same purpose—not at the containment of pandemics.

28.    The rules of statutory construction in Oklahoma are well-established. The Oklahoma Supreme Court has held that "[t]he fundamental rule of statutory construction is to ascertain and give effect to the legislative intent, and that intent is first sought in the language of a statute." *In re City of Durant*, 2002 OK 52, ¶ 13, 50 P.3d 218, 221. Courts give the words of a statute a plain and ordinary meaning, unless a contrary intention plainly appears. *Oklahoma Ass'n for Equitable Taxation v. City of Oklahoma City*, 1995 OK 62, 901 P.2d 800, 803. When "the language of a statute or ordinance is plain and unambiguous

and its meaning clear and no occasion exists for the application of rules of construction, the statute will be accorded the meaning as expressed by the language therein employed." *City of Bethany v. Hill*, 1973 OK 49, 509 P.2d 1364, 136.  Moreover, a statute that is ambiguous or has an uncertain meaning will be given a reasonable construction—"one that will avoid absurd consequences if this can be done without violating legislative intent." *Zaloudek Grain Co. v. CompSource Oklahoma*, 2012 OK 75, ¶ 7, 298 P.3d 520, 523. The Oklahoma Supreme Court has held that the "legislative intent may be expressed in an enactment's title." *City of Jenks v. Stone*, 2014 OK 11, ¶ 15, 321 P.3d 179, 183.

29.     The plain and unambiguous language of the RCPA makes clear that its intent is to control and prevent riots—not to contain the spread of pandemics. Specifically, the intent was to give officials additional power to put down civil disorder or prevent it from occurring in the first place in times of vulnerability. The RCPA limits circumstances under which the governor may proclaim a state of emergency under it to when he or she determines that "*a public disorder, disaster or riot exists* within this state or any part thereof which affects life, health, property or the public peace." tit. 21 § 1321.3 (emphasis added). These terms are not defined in the RCPA, but clearly an infectious disease does not qualify as a "public disorder" or "riot." Therefore, the only circumstance in the RCPA that could plausibly include a pandemic is a "disaster."

30.     In the context of the RCPA, "disaster" is intended to mean natural disasters such as floods or tornados, or man-made disasters such as bombings. The RCPA and OKC RCPA clearly do not contemplate pandemics. Black's Law Dictionary defines "disaster" as "[a] calamity; a catastrophic emergency." DISASTER, Black's Law Dictionary (11th ed.

2019). Merriam-Webster defines "disaster" as "a sudden calamitous event bringing great damage, loss, or destruction." *DISASTER, MERRIAM-WEBSTER.COM*, https://www.merriam-webster.com/dictionary/disaster?src=search-dict-hed (last visited Nov. 21, 2020).    It is clear that, after living through nine months of COVID-19, pandemics are not "sudden events." They are slowly-unfolding and long-lasting events.

31.    The remaining provisions of the RCPA indicate the term "disaster" was not intended to include pandemics. The powers given to the governor are tools that might be used to control violence and restore order—not public health tools to fight an infectious disease. The Catastrophic Health Emergency Powers Act (CHEPA) is clearly the proper law for addressing a pandemic—as is evident by its name and provisions. The term "disaster," then, read in context, is clearly limited to disasters in which it is more likely that public order will deteriorate. This considerably narrows the circumstances in which the statute applies, considering that many devastating events exist that could be described as "disasters," but for which giving riot control powers to the governor would not aid in addressing them. For example, the financial crisis in 2008 could be described as a disaster. For many, this was an emergency. Yet, no one would suggest that it would be appropriate to invoke the RCPA in response to that event. In contrast, flooding, wildfires, or tornados that require evacuation may leave vacant property susceptible to looting, which might be prevented by the tools given the governor under the RCPA. It would make complete sense that the governor would want to enact a curfew—a violation of which is a crime—when utilities and access to law enforcement may be nonexistent.

32.     Pandemics and infectious disease, while no doubt costly, pose no serious threat to public order. If anything, the existence of a contagious disease is likely to cause individuals to avoid direct contact with others, stay home, and avoid large crowds. Conditions under a pandemic are the opposite of the volatile, crowded conditions typically present just before rioting breaks out. And the irony is that the conditions precipitated by mandates such as those in the Proclamation—loss of job, homelessness, and substance abuse—are precisely the conditions that would foster a climate ripe for rioting.

33.     The exclusion of infectious disease from "disasters" comports with the powers conferred by the RCPA. In short, banning alcohol sales does nothing to contain a pandemic, but it is easy to see why the legislature thought it might be a useful tool in the event of a riot. The same goes for the RCPA's provisions that allow the governor to restrict gasoline, Molotov cocktails, and access to streets. The power to limit the size of gatherings in public areas and to close public parks, also given to the governor in an RCPA emergency, may be of some use in a pandemic, but they are more directly useful in taming civil disorder than in limiting spread of a virus. The rest of the powers conferred by the RCPA are obviously intended to be part of an anti-riot toolkit.

34.     The text of the RCPA also contemplates a short–duration state of emergency— not a rolling "crisis" that lasts for months, or years, as a pandemic does. The RCPA says that any state of emergency proclaimed under it "shall cease to exist upon the issuance of a proclamation of the Governor declaring its termination; provided that *the Governor must terminate said proclamation* <u>*when order has been restored*</u> *in the area affected.*" tit. 21 § 1321.3 (emphasis added).  Again, the focus of the RCPA is on the restoration of order,

not the mitigation of just any public threat. Reading pandemics into the RCPA renders perhaps the most important part of the RCPA meaningless—the safeguard that dictates when the governor's extraordinary powers should terminate and citizens' usual liberties be restored. A pandemic comes and goes with no discernable impact on public order. The only measure of whether the threat has abated is the eradication of the virus, but this provides no sure end date at all. If a state of emergency using this standard were proclaimed when the HIV/AIDS pandemic first appeared in Oklahoma, Oklahoma would today be in its 38th consecutive year under emergency rule.

35.     The OKC RCPA has almost identical language to the RCPA with respect to terminating the emergency. It must end when order is restored. CODE § 15-37. Eventually (one would assume), Mayor Holt will terminate the COVID-19 state of emergency. That can only be done when order is restored. How will anyone know when order is restored? What is the current state of disorder that must be restored in order to terminate the emergency? The City should provide this Court with the following information: 1) where the state of disorder currently exists in Oklahoma City, 2) a description of the current state of disorder, and 3) the conditions that must exist to consider the "order restored" in Oklahoma City. Will the "disorder" end when one vaccine is distributed publicly? Two vaccines? More than two? Or after a certain number of people receive the vaccine(s)? What if the vaccines turn out to be like the flu vaccine and require a new shot each year? And how do any of these things change our alleged state of "disorder" to a state of "order"? These are all questions that the citizens of Oklahoma City deserve answers to.

36.     The history and context of the RCPA's enactment in 1968 eliminates any doubt as to the intent of the law. Riots and the breakdown of law and order were top of mind for many Oklahomans in the late 1960s. This was due to fears about the civil unrest erupting in major cities in the United States. High-profile events during this time period included sit-ins and protests over the Vietnam War, the assassinations of Robert F. Kennedy and Martin Luther King, Jr., the chaotic Democratic National Convention in Chicago, and the launching of the Tet Offensive.

37.     The OKC RCPA was not intended to apply to pandemics, either. It does not contemplate pandemics and infectious disease within its scope. The structure of the OKC RCPA closely resembles that of the RCPA. The OKC RCPA permits a proclamation of emergency by the executive, includes similar language to the RCPA, and confers the same types of riot-fighting powers to the mayor as are given to the governor under the RCPA. The OKC RCPA was enacted days after the RCPA was passed. Given these similarities, the above analysis of the RCPA applies with equal force to the ordinances. This can only mean that the ordinances were not intended to be applied to combat pandemics and infectious disease.

38.     A "natural disaster" also does not encompass pandemics. Merriam-Webster defines "natural disaster" as "a sudden and terrible event in nature (such as a hurricane, tornado, or flood) that usually results in serious damage and many deaths." *NATURAL DISASTER, MERRIAM-WEBSTER.COM*, https://www.merriam-webster.com/dictionary/natural%20disaster (last visited Nov. 21, 2020). Common usage of "natural disaster" indicates an emphasis on the suddenness and naturalness aspects of this

definition. That is, a natural disaster is a disaster that 1) comes from nature, and 2) appears suddenly, with its direct damage inflicted immediately, even if negative after-effects are felt for a long period of time.

39.     References to "natural disaster" in Oklahoma statutes do not help the City's position. The term is defined a few times in state statute, and these definitions never specifically include infectious diseases or pandemics. Oklahoma statutes repeatedly use the term "natural disaster" to refer to damage or injury caused by weather calamities. For example, the Oklahoma Emergency Management Act defines natural disaster as "any natural catastrophe, including, but not limited to, a tornado, severe storm, high water, flood waters, wind-driven water, earthquake, landslide, mudslide, snowstorm, or drought . . . ." tit. 63 § 683.3. The term "natural disaster" is not used to refer to infectious diseases anywhere in Oklahoma law.

40.     It is an illogical stretch to conclude that the OKC RCPA applies to pandemics. To hold a position that the OKC RCPA is valid during this COVID-19 pandemic, one must conclude the following: the words "disaster" or "natural disaster" in a municipal ordinance that mostly pertains to riots and other civil disorder, and explicitly or implicitly derives its authority from something called the *Riot* Control and Prevention Act, includes pandemics and infectious diseases—even though they 1) do not threaten civil order; 2) that to counter pandemics, the drafters of the OKC RCPA chose to give the mayor tools that one would more naturally use to quell civil strife, such as the ability to ban possession of alcohol and flammable liquids; 3) that despite never mentioning pandemics or infectious diseases— even though the RCPA and OKC RCPA were passed around the time of another major

pandemic, the 1968 Hong Kong Flu—the drafters intended to include pandemics; and 4) above all, that when the legislature enacted the *Riot* Control and Prevention Act in 1968— in the midst of regular news reports and public discussion of riots across the country—part of the intent of the law was to delegate to cities the power to fight pandemics with emergency fiats from mayors. This is preposterous.

41.    Governor Stitt has <u>never</u> invoked the RCPA in his more than twenty executive orders and memorandums related to COVID-19. *See Executive Orders*, Oklahoma Secretary of State, https://www.sos.ok.gov/gov/execorders.aspx (last accessed Nov. 22, 2020). In contrast, his orders broadly, and repeatedly, invoke the Oklahoma Emergency Management Act and CHEPA. Governor Stitt's orders implement the powers granted him by those statutes. *Id.*

42.    Moreover, Governor Stitt's executive orders indicate that if he had intended to invoke the RCPA, then he would have done so explicitly. Weeks after his initial executive orders activating his powers under the OEMA and Constitution, Governor Stitt issued a separate executive order invoking the CHEPA. *Executive Order 2020-12*. https://www.sos.ok.gov/documents/executive/1927.pdf (last accessed Nov. 22, 2020). Note that the word "disaster" does not appear anywhere in this order. The use of separate orders to invoke the separate statutes, and Governor Stitt's direct citation in his executive orders to the statutes he is acting under, indicate that it is not the case that one gubernatorial proclamation of emergency activates all of the other emergency powers statutes. Instead, Governor Stitt views his own powers as being triggered only when he declares an emergency *under the statute he is seeking to put into effect*.

43.     The power delegated to municipalities by the RCPA delegates can only be used in the event the governor declares an emergency pursuant to the RCPA. *See* tit. 21 § 1321.9. Construing the RCPA as empowering municipalities to act independently of the governor would allow for ordinances that *conflict* with the RCPA. Such an interpretation would effectively transfer the power to determine when emergency powers should be activated from the governor to the mayors. In a circumstance where a mayor believes an emergency proclamation is justified, but the governor disagrees, this interpretation would fundamentally alter the operation of the RCPA. A municipal ordinance that purports to divest the authority of the governor to make the call whether an emergency exists that justifies the use of RCPA powers cannot be said to be made "in general conformity with" the RCPA, as this role given to the governor as a central feature of the law.

44.     In summary, Defendants are trying to fit a square peg in a round hole. Because Mayor Holt and the City are clearly acting outside the scope of the RCPA and OKC RCPA, this Court is well within its authority to issue a declaratory judgment stating that the Proclamation is unlawful and must not be enforced.

### SECOND CAUSE OF ACTION
### Violation of the Oklahoma Constitution

45.     Plaintiffs hereby incorporate by reference all stated paragraphs.

46.     Pursuant to 12 O.S. § 1651, Plaintiffs request this Court to determine that the Proclamation violates Article 2, Section II of the Oklahoma Constitution, which states that "all persons have the inherent right to life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own industry."

47.     The Proclamation directly infringes on Plaintiffs' constitutional right to the enjoyment of the gains through their own industry. In particular, the Proclamation prevents Plaintiffs from operating their businesses or working in the food-service industry in any meaningful way after 11:00 p.m. while every other business in Oklahoma City that does not serve food or drinks may remain open and have an unlimited number of people in their building.

48.     Mayor Holt and the City of Oklahoma City have not provided any rational reason or authority to prevent Plaintiffs from operating their businesses (in a meaningful way) or work past 11:00 p.m. when plenty of other businesses may do as they please after 11:00 p.m. This is a violation of the Oklahoma Constitution.

**THIRD CAUSE OF ACTION**
**Violation of State Law**

49.     Plaintiffs hereby incorporate by reference all stated paragraphs.

50.     Pursuant to 12 O.S. § 1651, Plaintiffs request this Court to determine that the Proclamation violates 11 O.S. § 14-101 and that Mayor Holt is acting ultra vires.

51.     Section 14-101 of Title 11 of the Oklahoma Statutes states, "The municipal governing body may enact ordinances, rules and regulations not inconsistent with the Constitution and laws of Oklahoma for any purpose mentioned in Title 11 of the Oklahoma Statutes or for carrying out their municipal functions."

52.     Mayor Holt apparently believes that a disaster has struck Oklahoma City, thereby allowing him to activate the OKC RCPA. As detailed above, the COVID-19 pandemic is clearly not considered a "disaster" under the terms of the OKC RCPA.

53.     Mayor Holt is acting ultra vires because he is using a municipal ordinance to declare an emergency when the conditions required to invoke said ordinance do not exist. The provisions of the OKC RCPA can only go into effect when a public disorder, disaster, or riot exists. Since none of those things exist and Governor Stitt has not declared an emergency pursuant to the RCPA, Oklahoma City's activation of and actions pursuant to the OKC RCPA are inconsistent with the Constitution and laws of Oklahoma. While the City's enactment of the OKC RCPA was legal, its current use of the OKC RCPA is illegal. This directly violates 11 O.S. § 14-101.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask this Court:

A. to declare that Defendants acted ultra vires by issuing the Proclamation and that Defendants violated Plaintiffs' constitutional rights as set forth in this Petition;

B. to enjoin Defendants' enforcement of the Proclamation; and

C. to grant such other and further relief as this Court should find just and proper.

Respectfully Submitted,

Frank A. Urbanic, OBA No. 32528
The Urbanic Law Firm, PLLC
1211 N Shartel Ave Ste 906
Oklahoma City, OK 73103
Phone: (405) 633-3420
Fax: (405) 446-8413
Email: Frank@Urbanic.Law
Attorney for Plaintiffs